# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

JOHN WILLIAM LONG,

                          Petitioner,          :     Case No. 1:23-cv-714

    - vs -                                District Judge Matthew W. McFarland
                                             Magistrate Judge Michael R. Merz

WARDEN, Pickaway Correctional
  Institution,

                                         :

                    Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case, filed *pro se* by Petitioner John William Long pursuant to 28 U.S.C. § 2254 to obtain relief from his conviction for murder in the Hamilton County Court of Common Pleas. Relevant pleadings are the Amended Petition (ECF No. 15), the State Court Record (ECF No. 20) and Return of Writ (ECF No. 21) filed by Respondent, Petitioner's Reply (ECF No. 25), Respondent's Amended Return (ECF No. 28) and Supplemental State Court Record (ECF No. 29). Petitioner has waived his opportunity to file an amended reply (ECF No. 32).

**Litigation History**

On April 14, 2004, almost twenty-one years ago, a Hamilton County grand jury indicted Long on one count of murder (Indictment, State Court Record ECF No. 20, Ex. 1). The case was tried to a jury which convicted Long, who was then sentenced to a term of imprisonment of fifteen

1

years to life (Judgment, State Court Record, ECF No. 20, Ex. 4). Represented by different counsel, he appealed to the Ohio First District Court of Appeals which affirmed the conviction. *State v. Long*, Case No. C-040643 (Ohio App. 1ˢᵗ Dist. Oct. 26, 2005)(unreported; copy at State Court Record, ECF No. 20, Ex. 8). The Ohio Supreme Court declined to exercise jurisdiction over a subsequent appeal. *Id.* at Ex. 11.

On January 10, 2006, Long filed an application pursuant to Ohio App. R. 26(B) to reopen his direct appeal (State Court Record, ECF No. 20, Ex. 12) which the court of appeals found barred by *res judicata*. *Id.* at Ex. 18. The Ohio Supreme Court declined to exercise jurisdiction over a subsequent appeal. *Id.* at Ex. 20.

This Court dismissed Long's first habeas corpus petition with prejudice. *Long v. Jackson*, Case No. 1:06-cv-787 (State Court Record, ECF No. 20, PageID 474, *et seq.*). He was denied a certificate of appealability both by this Court and by the Sixth Circuit.

Long next sought to have his sentence vacated because he asserted it was void for inclusion of a term of post-release control. The First District agreed and on January 6, 2011, Long was resentenced consistent with the state appellate court's decision. (ECF No. 20, Ex. 34). He did not appeal.

On January 14, 2013, Long, *pro se*, filed a petition to vacate and or set aside the judgment of conviction in the trial court. (ECF No. 20, Ex. 60). That court dismissed the petition for lack of jurisdiction under Ohio Revised Code § 2953.23, finding the petition to be untimely (ECF No. 20, Ex. 63). The First District dismissed an appeal for failure to file a transcript (ECF No. 20, Ex. 66). The Ohio Supreme Court again declined jurisdiction (ECF No. 20, Ex. 70).

After a number of other unsuccessful state court actions, Petitioner filed his second habeas corpus petition in this Court (ECF No. 3). Petitioner recites that he placed the Petition in the prison

mailing system on October 9, 2023, but it was not received and docketed until November 1, 2023. This Court then transferred the case to the Sixth Circuit as a second or successive habeas petition (ECF No. 4). The circuit court determined its permission was unnecessary because the Petition was not second or successive within the meaning of 28 U.S.C. § 2244. *In re Long,* 2024 U.S.App. LEXIS 21423 (6th Cir. 2024)(copy at ECF No. 8). It remanded the case for further proceedings and the Court ordered Respondent to answer (ECF No. 9).

Long pleads the following grounds for relief:

> **Ground One (a):** The State of Ohio and/or it's agents intentionally suppressed exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963(parallel citations omitted) and this resulted in a violation of Petitioner's Fourteenth Amendment due process rights to a fair trial.

> **(b) Supporting Facts:** In 2019, after Petitioner obtained a court order granting leave to request public records, See *State v. Long,* 2018 Ohio 4194, Defendant was able to obtain public records from the Cincinnati Police and the Hamilton Co. Coroners' Office. The files obtained contained favorable evidence that had been intentionally and strategically suppressed. It has been determined by the Ohio First District Court of Appeals that petitioner was "unavoidably prevented" from discovering the evidence that his motion for a new trial was supported with. See *State v. Long*, 2021 Ohio 2835. On October 17, 2019 Petitioner filed a motion for a new trial pursuant to Crim. R. 33(B) and attached to that motion were copies of the newly discovered evidence that Petitioner was using to demonstrate his right to a fair trial were violated.

> (c) The newly discovered evidence (NDE hereinafter) Petitioner obtained was a Homicide Unit Narrative Report, suppressed statements of Brandy Jones, Steve Wyatt, Shelise Gilmore and Patrina Crawford, a Cincinnati Police Investigative Log and the Hamilton Co. Coroner's Chain of Custody. This evidence supported the assertion that the assailant was injured during the commission of the offense and left blood at the crime scene, that was collected by investigators; an eyewitness (Shelise Gilmore) had identified John E. Long from a photo array and homicide detective Jennifer Luke committed perjury by misleading the defense and jury about the existence of evidence suggesting that an injured perpetrator had left a "blood trail" over material pieces of evidence found at the crime

3

scene; Detective Luke also committing perjury by testifying that no eyewitness ever identified the "wrong John Long" from a photo array, when in actuality evidence was discovered that the State were poised to indict John E. Long in December of 2003, based on the November 7, 2003 eyewitness identification of John E. Long by Shelise Gilmore. These were suppressed pretrial witness statements that had impeachment value. Also, uncovered in the case file was the photo array statement of Patrina Crawford who selected Petitioner from a photo array on June 15, 2004, sixty days after Petitioner was indicted. At trial, this fact was concealed by the State. The suppressed evidence impeded petitioner's ability to defend himself against the indicted charges. See Defendant Request for Probable Cause Hearing, In Re: ORC 2935.09/10 Affidavit of Accusation, filed on 4.20.21 filed in the Hamilton County Court of Common Pleas in case number B-0402803.

The NDE obtained from the Hamilton County Coroner's Office was a Case History Report and the Chain of Custody Report. These reports were suppressed and provided impeachment material in regards to forensic scientist Joan Burke trial testimony, who testified, for the State, that she did not conduct any definitive DNA tests on any on items of evidence discovered at the crime scene that had blood evidence on them. The Chain of Custody established Burkes' testimony to be inaccurate and false because the Chain of Custody Report indicates what items of evidence had electronic "DNA records" created in connection to the blood found on items of the victims clothing found at the crime scene (Dl#03015672, ltem4-5, Chain of Custody Report). This report clearly establishes that examinations and tests were conducted on biological evidence found at the crime scene and the results of that testing was suppressed from the defense. This suppressed report withheld favorable and material evidence that the perpetrator left his blood at the scene, petitioners' DNA was tested against the DNA found at the scene and an "exclusion result" was obtained that was material to petitioner's guilt or innocence. This evidence when considered in conjunction with the suppressed statements of Steve Wyatt and Brandy Jones establishes that the perpetrator was injured during the commission of the offense and this evidence was intentionally and strategically suppressed.

**Ground One(B):** Longs' due process rights were violated when the State knowingly used false testimony at trial and allowed that false testimony to go uncorrected, in violation of the holdings in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and the Fourteenth Amendment right to a fair trial.

**Supporting Facts**: In 2019, when Long obtained the case file from the CPD and the Chain of Custody Report from the Hamilton County Coroner's Office it was discovered that the State, in their case in chief, had used the false testimony of Jennifer Luke when evidence proved that Luke committed perjury when she testified to such because Shelise Gilmore had identified John E. Long as the perpetrator of this murder and the state was poised to indict John E. Long in December of 2003. Hamilton County Prosecutor Mark Piepmeier allowed this false testimony go uncorrected at trial. At trial, Joan Burke from the Hamilton County Coroner's Office testified that (1) no conclusive testing was performed on Items 4-5 (victims blue jeans). Long's DNA was collected and compared to the DNA found on the victims blue jeans, testing was conducted on that item of evidence and the results of that testing was intentionally and strategically suppressed.

**Ground Two**: Petitioner received ineffective assistance of counsel and this violated petitioner's 6th amendment right to effective assistance of counsel and his 14th amendment right to due process.

**(a) Supporting Facts**: Trial counsel was ineffective for failing to investigate any potential pretrial statements made by witnesses Shelise Gilmore, Patrina Crawford, Melissa Howell, and Ruby Gentry. These witnesses were at the scene the night of the offense and after receiving the case file from the Cincinnati Police it became evident that these witnesses' pretrial statements were material to preparing an effective defense. Prior to trial, defense counsel was made aware that there was a problem with Brandy Jones possible trial testimony and the state conceded that Brandy Jones was a potential defense witness. Trial counsel failed to secure Jones' testimony at trial.

(Amended Petition, ECF No. 15, PageID 170-73).

# Analysis

## Statute of Limitations

Respondent asserts Long's Petition is barred by the statute of limitations.

The Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") adopted for the first time a statute of limitations for habeas corpus petitions

which is now codified at 28 U.S.C. § 2244(d) which provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

The judgment on which Petitioner is now imprisoned is that of January 6, 2011 (State Court Record, ECF No. 20, Ex. 34).  Petitioner took no appeal from that judgment, so it became final thirty days later, February 5, 2011, the last day on which any appeal could have been taken.  Measured under § 2244(d)(1)(**A**), the Petition here, not filed until October 9, 2023, is untimely by more than twelve years.

As anticipated by Respondent, Long defends the timeliness of his Petition under 28 U.S.C. § 2244(d)(1)(D).  He states in his Reply:

6

>  Respondent has asserted incorrectly that Long's petition is time
>  bared [sic] under the provisions of 28 USC 2244(d)(l)(D). When the
>  appellate court reversed and remanded the trial court['s] denial of
>  Long's Crim.R.33(B) motion for leave to file a new trial motion
>  based on newly discovered evidence, the appellate court found that,
>  (1) "The record on appeal shows that, despite his diligent efforts
>  thereafter to gain access to those records, Long did not receive his
>  case file until May 2019 and (2) "the common pleas court's decision
>  denying Long's motion for leave was not supported by the record.
>  To the contrary, the record provides clear and convincing proof that
>  Long had been "unavoidably prevented" from timely discovering
>  and presenting in a new-trial motion the evidence upon which his
>  new trial motion depended, and that under the circumstances, a 90-
>  day delay in filing the motion after that evidence was discovered
>  was understandable and not unreasonable." (Emphasis added) *State
>  v. Long,* 2021 Ohio 2835, (Doc.20:PAGEID#1387-96).
>
>  For the purposes of 2244(d)(l)(D) the appellate court determined
>  May 14, 2019 as the date that the factual predicate of Long's claims
>  were discovered, therefore the AEDPA clock begun to run on that
>  date and stopped on the date Long's properly filed Crim.R.33(B)
>  Motion for Leave to File a New Trial Motion which was August 9,
>  2019. (Doc.20:PAGEID#l407) This period totaled (86) days, but the
>  court of appeals cited (90) days so for the sake of uniformity, Long's
>  concedes the (90) days. See (Doc. 20- l:PAGEID#1401- l407) The
>  clock was tolled until Long had exhausted his state court remedies,
>  which was April 24, 2024, the date the Ohio Supreme Court
>  declined to accept jurisdiction of Long's case. (Doc. 20-1 :PAGEID#
>  1812) The time from April 24, 2024 until November 1, 2024 is (191)
>  days plus the (90) days the appellate court calculated (191 + 90 =
>  281), well within the 2244(d)(l)(D) statute of limitations, therefore
>  Long's petition is timely.

(Reply, ECF No. 25, PageID 2915-16).  This argument requires unpacking.

In the cited 2021 decision, Long's case was before the First District Court of Appeals on

appeal from a denial in the Hamilton County Court of Common Pleas of Long's motion under

Ohio R. Crim. P. 33(B) for leave to file a delayed motion for new trial.  *State v. Long*, 2021-Ohio-

2835, ¶1.  That Rule provides that a motion for new trial based on newly-discovered evidence must

be filed within 120 days after the verdict unless "it is made to appear by clear and convincing

evidence that the defendant was unavoidably prevented from the discovery of the **evidence** upon

which he must rely . . ..." (emphasis supplied)

Thus the question before the First District was a question of fact – what prevented Long from discovering the evidence that he submitted with his motion for new trial? – and applying Ohio law to those facts: did they show by clear and convincing evidence that Long had been unavoidably prevented from discovering his proposed new evidence? Note that the ultimate question is one of Ohio law and relates to the discovery of evidence, not claims or "factual predicates."

The First District Court of Appeals decided Long had met the Ohio Crim. Rule 33(B) standard. In part it noted that Long as a criminal defendant could not use the Ohio Public Records Act to obtain records until after the Supreme Court of Ohio decided the exception in that statute for criminal defendants "does not extend past the completion of the criminal procedure for which the requested information had been gathered." *State v. Long, supra*, at ¶ 14, citing *State ex rel. Caster v. Columbus*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598, ¶ 47, overruling in part *State ex rel. Steckman v. Jackson,* 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), and *State ex rel. WLWT–TV5 v. Leis,* 77 Ohio St.3d 357, 673 N.E.2d 1365 (1997). That is, Long could not use the Public Records Act to gather evidence before the *Caster* decision in 2016.

The First District's decision does not record when Long made his public records request, but notes he did not receive his case file until May 14, 2019. *State v. Long, supra,* at ¶ 14. He then filed his Motion for Leave to File a Delayed Motion for New Trial in August 2019. *Id.* The First District held the delay in filing from May until August was not "unreasonable."[1] It ordered the Common Pleas Court to grant leave to file and then to consider the motion for new trial on the

---

[1] For reasons not material here, the Ohio Supreme Court has, since the First District's decision in this case, substantially altered the law on delay in filing a motion for leave to file a delayed motion for new trial. See *State v. Bethel*, 167 Ohio St. 3d 362 (2022); *State v. McNeal*, 169 Ohio St. 3d 47 (2022); *State v. Hatton*, 169 Ohio St. 3d 446 (2022).

merits. *State v. Long, supra,* at ¶ 16.

The First District thus decided a question of Ohio law: had Long shown by clear and convincing evidence that he was unavoidably prevented from filing his motion for new trial within 120 days of verdict? The First District did **not** decide the federal law question presented by Long's reliance on § 2244(d)(1)(D): whether the factual predicate of the claim or claims presented could have been discovered sooner through the exercise of due diligence. Nor did the First District have occasion to decide the federal law question. The question before that court was not whether Long's filing satisfied the federal statute of limitations, but rather whether Long's filing of the newly-discovered evidence on which he relied in seeking a new trial had been "unavoidably prevented." Since the Ohio Supreme Court did not interpret the Ohio Public Records Act so as to allow Long to discover the "newly discovered evidence" until it decided *Caster* in 2016, obviously it could not have been done within 120 days of the verdict which was handed down before sentencing in September, 2004.

Respondent argues that, regardless of when he obtained the **evidence** relied on in his new trial motion, Long knew the **factual predicates** of his claims long before he obtained his case file in May, 2019 (Amended Return, ECF No. 28, PageID 3026-28). That is, in documents prepared and filed by Long well before he obtained his case file, he adverted to the existence of documents which would establish his claims – *Brady/Napue* violations and ineffective assistance of trial counsel -- even though he had not yet been able to obtain copies of those documents.

Respondent's cited record references are strong proof Long knew the factual predicates of his claims as much as ten years before he received his case file in May, 2019. Long does not offer rebuttal to these references in is Reply[2], insisting May, 2019, is the relevant date for assessing his

---

[2] Long argues instead that the State intentionally thwarted his attempts to obtain post-conviction relief (Reply, ECF No. 25, PageID 2916). Whether or not the State defended the conviction it had obtained simply does not speak to the

knowledge. The Magistrate Judge, however, accepts Respondent's argument: Long knew the factual predicate for his claims long before he received his case file which included his "newly discovered evidence" in May 2019. As the Sixth Circuit has held, "[d]iscovering the 'factual predicate' of a claim is not the same as proving a claim [i.e. by submitting evidence]." *Deaton v. Hildebrand*, 2024 U.S. App. LEXIS 2417 at *6 (6th Cir. 2024).

As early as June, 2009, Long knew of the existence of human blood on physical evidence at the Hamilton County Crime Lab (Request for Court Order to Preserve Evidence, State Court Record, ECF No. 20, Ex. 35). Long has persisted in his assertion of this fact. In his Petition for Post-Conviction Relief filed in January 2013, he evinced knowledge of many of the claims he now makes (ECF No. 20, PageID 726, *et seq.*). In his June 21, 2018, DNA testing application, he refers to blood evidence being withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)(ECF No. 20, PageID 919, *et seq.*).

By Long's account the statute does not begin to run until May 14, 2019 (Reply, ECF No. 25, PageID 2915). It then runs eight-six days until it is tolled by the filing of Long's motion for leave to file a delayed motion for new trial. *Id.* Long asserts it remains tolled "until Long had exhausted his state court remedies, which was April 24, 2024, the date the Ohio Supreme Court declined to accept jurisdiction of Long's case." *Id.* at PageID 2916.

Long relies on 28 U.S.C. § 2244(d)(2) which provides "(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." However, not every state court post-conviction filing tolls the statute. Instead, to toll the statute, the filing must be (1) properly filed and (2) seeking relief from the pertinent

---

question whether Long knew he had claims to make and what their factual predicates were.

judgment.

The First District's decision reversing the trial court's denial of leave to file a motion for new trial was entered August 1, 2021 (ECF No. 20, Ex. 134).  That court's eventual decision affirming denial of the new trial motion was entered January 18, 2023 (ECF No. 20-1, Ex. 158). Long timely appealed from the First District's affirmance of denial of his motion for new trial, but the Ohio Supreme Court declined jurisdiction on April 11, 2023 (ECF No. 20-1, Ex. 164).  At that point the statute began to run again and expired 279 days later on January 15, 2024, unless again tolled.  If time is measured from the Supreme Court's denial of review of denial of the new trial motion, the Petition was timely filed on October 9, 2023.  However, because Long had previous knowledge of the factual predicates of his claims, May 2019 is not the appropriate starting date.

Long asserts the statute did not begin to run again until April 24, 2024, which he says is the date the Ohio Supreme Court "declined to accept jurisdiction of Long's case."  However, for that proposition he cites Doc. 20-1, PageID 1812 (Reply, ECF No. 25, PageID 2916) which is the Supreme Court entry of April 11, 2023, not April 24, 2024.

In sum, the statute of limitations ran many years before Long received his case file on May 14, 2019, and the Petition should be dismissed as time-barred.


**Merits**


In the alternative, if the Court overrules the limitations defense and reaches the merits, the Petition should still be dismissed.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is

contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000); *Hendrix v. Palmer,* 893 F.3d 906, 917 (6th Cir. 2018). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

**Prosecutorial Misconduct Claim**

In affirming the Common Pleas Court's denial of the motion for new trial, the First District Court of Appeals decided Long's suppression of evidence and ineffective assistance of trial counsel claims on the merits. As to the suppression of evidence claim, the First District held:

> {¶14} Prosecutorial misconduct in failing to disclose, upon request, evidence "material either to guilt or to punishment" violates the fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Brady* at 87. This principle extends to wrongfully withheld evidence undermining a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The *Brady* rule applies regardless of whether the evidence is suppressed by the state willfully or inadvertently. *Strickler v. Greene*, 527 U.S. 263, 280, 199 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

> {¶15} In order to establish a due-process violation under *Brady*, the defendant must demonstrate that: "(1) the prosecution failed to disclose evidence upon request; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *State v. Goney*, 2d Dist. Greene No. 2017-CA-43, 2018-Ohio-2115, ¶ 66. Evidence is favorable to the accused when it is exculpatory or impeaching. *State v. McNeal*, Slip Opinion No. 2022-Ohio-2703, ¶ 20, citing *Strickler* at 281-282.

"Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles [v. Whitley*, 514 U.S. 419,] at 433, [115 S.Ct. 1555, 131 L.Ed.2d. 490 (1995)], quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A different result is reasonably probable "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434, quoting *Bagley* at 678.

*McNeal* at ¶ 20.

### Alleged *Brady* Violations

{¶16} In reviewing Long's alleged *Brady* violations, we keep in mind that, at trial, (1) the only issue in dispute was the identity of the murderer, (2) there was physical evidence connecting Long to the crime scene, namely the victim's blood on his denim shorts found at the crime scene and a bus-ticket receipt in Long's name found in those shorts, and (3) there was testimony from an eyewitness who knew Long from the neighborhood and identified him from a photo array as the man she saw fleeing from the loading dock where the victim was murdered. We evaluate Long's claimed *Brady* violations to see if, considering the evidence introduced at trial and in the record before us, whether this new evidence undermines confidence in the outcome of the trial.

{¶17} <u>Officer Coombs's report</u>. With respect to Long's argument that Officer Coombs committed perjury when he testified at trial that he was the one who had found the denim shorts in the alley, we hold that that Police Officer Coombs's report indicating that he "recovered" nothing from the crime scene is not favorable evidence that undermines confidence in the outcome of the trial, and thus, its suppression is not a *Brady* violation. Officer Coombs only testified at trial that he had been the one to spot the denim shorts but had told the jury that a different officer "recovered" the denim shorts and removed them to the police's property room prior to submitting the evidence to the coroner's lab for forensic testing.

{¶18} <u>Patrina Crawford's statements</u>. Next, Long argues that Crawford's statements made to police prior to her identification of Long demonstrate how her testimony changed or evolved over time to "fit what the State needed her to say" in order to secure a conviction. Specifically, Long points to Crawford's August 18, 2003

statement where she described the suspect as having "no hair, baldheaded * * * small head * * * funny shaped head." While this statement is favorable to Long because he is not bald, the jury heard testimony from Crawford that she initially thought the suspect was bald, but then presumed that Long must have been wearing a "stocking cap" the night of the murder. Pictures of Long from roughly the late 1990s to 2003, the year of the murder, show Long with dreadlocks, but the pictures closer to 2003 demonstrate that Long's hair was cut shorter, closer to his head. Because the jury was aware that Crawford initially thought the suspect looked bald, these statements, which are consistent with Crawford's testimony at trial, do not undermine confidence in the outcome of the trial, and the failure to turn over these statements does not constitute a *Brady* violation.

{¶19} <u>Shelise Gilmore's November 2003 statement</u>. Long argues that the lead detective "lied" when she testified no one identified John E. Long from the photo lineup. He contends that Gilmore identified John E. Long from a photo array as the man she saw fleeing from the loading dock the night Spikes was murdered. In her November 7, 2003 statement to police, which was her second time talking with police, Gilmore said that there were two men standing near her and Crawford on the street corner the night Spikes was murdered. She identified John E. Long from a photo array as one of those men but said she had not known his name at the time. When the detective asked Gilmore if John E. Long "was the same person running from that scene," Gilmore responded, "It was dark but it looked like him." Although this statement is favorable to the defendant, and should have been disclosed to him, when viewed in context with Gilmore's other statements and evidence presented at trial, and the fact that the victim's blood was found on Long's denim shorts at the crime scene, we cannot say that this evidence undermines confidence in the outcome of the trial, and thus, it does not satisfy the materiality component of a due-process violation under *Brady*.

{¶20} Gilmore gave three statements to police. In her first statement, shortly after the murder, she and Crawford were questioned separately but both gave a similar description of the suspect they saw fleeing from the scene. Crawford had a better view of the suspect because she was closer to the loading-dock ramp and Gilmore was across the street on the phone reporting the crime. Notably, Gilmore and Crawford were both shown a photo array within a few days of the murder, which contained a picture of John E. Long, but neither identified John E. Long as the suspect they saw fleeing that night. Gilmore gave her November 2003 statement, her

14

second statement, prior to the police determining that the bus-ticket receipt, found in the pocket of the denim shorts at the crime scene, belonged to defendant. After the investigation began to focus on defendant, Gilmore was stopped by police on an unrelated matter, brought into the station, and shown a photo array, which included a picture of the defendant. At first, Gilmore said she did not recognize anyone but when the officers picked up the array, Gilmore started crying, and identified Long as the person she had seen fleeing that night. After Gilmore identified Long, the lead detective explained to Gilmore that the police could not believe anything Gilmore said because she kept changing her story.

{¶21} Gilmore did not testify at trial because she was incapacitated from a beating. Thus, she did not identify Long at trial. Nor was her pretrial identification of Long admitted into evidence. Thus, the jury did not hear that there was another eyewitness who identified Long.

{¶22} Because she did not testify, Gilmore could not have been cross-examined about her prior identification of John E. Long. Long argues, however, that the lead detective could have been confronted on cross-examination after she testified that no one had identified John E. Long from a photo array. The jury would have also heard that the police had concluded that Gilmore's statements were unreliable and, perhaps, that she had identified Long too.

{¶23} We first note that a fair interpretation of the lead detective's testimony is that no one identified John E. Long from the first photo array. This is true. Neither Crawford nor Gilmore identified him. But beyond that we agree that Gilmore's second identification should have been turned over. As Long points out, it could only have been used to impeach the lead detective. Based on this record, there is no suggestion that Long would have done anything further with respect to investigating John E. Long. His identity, and his identification as a suspect, were known to Long and were covered fully during the trial.

{¶24} Therefore, as noted above, viewing Gilmore's November 2003 statement in context with her other statements, and considering the evidence admitted at trial of Long's guilt, we hold that Gilmore's November 2003 statement, while it should have been disclosed to the defense, ultimately does not constitute a due-process violation under *Brady* because it does not undermine confidence in the outcome of the trial.

{¶25} <u>Statements of Brandy Jones and Steve Wyatt</u>. Long claims that Jones's and her boyfriend Steve Wyatt's statements to police

15

demonstrate that the "bloodied man" who had tried to enter the apartment building the night of the murder had cut his hand. Long contends that this is evidence that the killer cut himself while stabbing Spikes and left his blood, and thus, the killer's DNA, at the crime scene. Long also argues that this proves the lead detective covered up the fact that "unknown blood" had been found at the crime scene. But upon reviewing Jones's and Wyatt's statements to police, we hold that they are not favorable to Long. First, neither Jones nor Wyatt had seen a cut on the person trying to enter the building. Wyatt only said that the man's hand was bloody. And Jones had told the lead detective that the man's hands had looked yellowish, like bruises or as if his hands had been burned like "somebody who uses crack cocaine." In explaining why she did not call the police after her encounter with this "bloodied man," she stated that she thought the man may have been drunk and maybe had blood on him not because he had just killed someone but because he had cut himself. She did not see any cuts on this person. Also, her description of the "bloodied man"—a man with a slim build and "short braids"—somewhat matches Long's physical appearance. Finally, in her January 14, 2004 statement, Jones viewed a photo array that contained Long's picture, and identified Long as the man who had tried to enter the apartment building that night. Contrary to Long's argument, these statements were not favorable to Long and do not amount to a *Brady* violation.

{¶26} <u>Witness statements of Shelise Gilmore, Ruby Gentry and Melissa Howell</u>. Long claims that these witnesses' statements, which described the fleeing suspect with differing heights, and Gentry's statement, where she said that she had overheard Gilmore say that her friend had killed the victim, should have directed the investigation away from him. But the police did investigate other people at first, including John E. Long, prior to learning that the bus-ticket receipt found in the pocket of the denim shorts, which had the victim's blood on it, belonged to Long. Long has not shown how these statements are relevant to the issue of whether he received a fair trial. It was clear from the evidence admitted at trial that detectives investigated several people prior to focusing their investigation on Long. Further, Ruby Gentry and Gilmore both eventually identified Long as the suspect they saw fleeing the night of the murder. These witnesses' statements are not exculpatory and do not constitute a *Brady* violation.

{¶27} <u>The lead detective's "Request for Bank Records, John E. Long III, Murder of Amerrintha Spikes.</u>" The bank-records request included the lead detective's statement that Gilmore and Crawford had described the suspect as "a short, stocky built black man with a

light complexion [who] was 'naked' and had a very funny shaped head." Long contends Gilmore and Crawford's description of him should have kept police from considering him as a suspect because he is not stocky, but slim, and does not have a funny shaped head. While the statements could have been used to challenge Crawford's testimony at trial, we cannot say that this evidence undermines confidence in the outcome of the trial where Crawford identified Long as the man she saw fleeing the scene the night of the murder, and where other witnesses, namely Jones and Howell, both described the suspect as "slim" in their statement to police. The state's failure to disclose this evidence to defense does not rise to a *Brady* violation.

{¶28} Coroner's Chain-of-Custody Report. Long argues that the chain-of-custody report demonstrates that the state suppressed exculpatory DNA results—specifically a result that excluded him and the victim as contributors to the blood found on the victim's jeans. He claims that because the report demonstrates that the victim's clothing was submitted to the coroner's office for testing and because the result of that testing was not included on criminalist Joan Burke's fifth laboratory report admitted at trial, which only stated that the victim's blood was found on Long's denim shorts and that Long was excluded as a donor of the semen found in a condom located at the crime scene, then this proves two things: the victim's clothes were tested and an exclusionary DNA test result was suppressed. First, Joan Burke, a forensic examiner with the coroner's office testified that she had tested the victim's clothing for the presence of blood. This is not new evidence. Second, Long's theory that the chain-of-custody report, along with Brandy Jones's statements, proves that the state suppressed an exculpatory DNA test result is not supported by any evidence in the record and is purely speculative. There was no evidence, as Long claims, that establishes that the murderer had cut himself and left blood at the crime scene. Further, even if Long had been excluded as a contributor to the blood on the victim's pants or other blood recovered at the scene, this does not mean that he is exonerated. Long applied for DNA testing on blood recovered from the crime scene in the past but the common pleas court denied that application, finding that any result would not have been outcome determinative.[1] This court affirmed that judgment. *See Long*, 1st Dist. Hamilton No. C-120521.

{¶29} Long also argues that Burke lied at trial about testing the victim's clothing and about the type of evidence that was labeled as "Item 17" on the chain-of-custody report. The report indicates that Item 17 was the victim's pants. At trial, Burke was questioned about her fifth laboratory report which included testing on items of

evidence numbered 16 and 18. When asked what and where was "Item 17," Burke replied that she did not know. She stated that her "best educated guess" was that Item 17 was the defendant's denim shorts because his shorts had been submitted to the coroner's office for testing more than once. But she emphasized at trial that she was just guessing and had no record of Item 17 in her notes. The chain-of-custody report indicating that Item 17 was the victim's pants does not prove that Burke was lying at trial and is simply not exculpatory evidence. The suppression of the chain-of-custody report does not constitute a due-process violation under *Brady*.

*State v. Long*, 2023-Ohio-132, ¶¶ 14-29 (Ohio App. 1st Dist. Jan. 18, 2023).

In rejecting Long's suppression of evidence claims, the First District applied the correct law, to wit, the clearly established precedent of the United States Supreme Court as of the date the case was decided. "Clearly established law" refers to the holdings, as opposed to the dicta, of Supreme Court decisions at the time of the relevant state court decision. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (citations omitted), *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004), *quoting Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Cornwell v. Bradshaw*, 559 F.3d 398, 404-405 (6th Cir. 2009).

"The 'unreasonable application' clause, 28 U.S.C. § 2254(d)(1), requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.* "[A] state court's application of federal law is unreasonable 'only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes.'" *Hill v. Mitchell*, 2013 U.S. Dist. LEXIS 45919 (S. D. Ohio Mar. 29, 2013), *quoting Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

"[T]he AEDPA standard is 'difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction.'" This interpretation of the AEDPA standard

appears to grant much more deference to state decisions when we review them under AEDPA than the earlier interpretation in *Williams v. Taylor* . . ." *Peak v. Webb*, 673 F.3d 465(6th Cir. 2012)(Merritt, J., concurring), *quoting Greene v. Fisher*, 565 U.S. 34 (2011)(unanimous opinion); *Jackson v. Houk*, 687 F.3d 723 (6th Cir. 2012), again quoting *Greene*.

As the lengthy quotation from the First District's decision shows, that court did not make a slap-dash summary rejection of Long's *Brady* and *Napue* claims. Instead, it discussed each piece of "newly discovered evidence" and analyzed whether it was *Brady* material and whether or not it was material, i.e. whether its presentation would likely have been outcome determinative.

Long attempts to overcome the First District's decision in his Reply by offering his own thirteen-page competing analysis, presented in italic type between quoted paragraphs of the appellate decision (Reply, ECF No. 25, PageID 2920-33). Taken together, Long's critiques do not show that the First District unreasonably determined the facts or unreasonably applied the law in deciding Long's suppression of evidence claim. As that court held, the only question at trial was the identity of the murderer and compelling physical evidence – the victim's blood on his shorts left at the scene and a bus ticket in his name in those shorts – places Long at the scene at the time of the murder. The weight of that physical evidence is not significantly undermined by newly-discovered evidence which might have been used in impeachment.

**Ineffective Assistance of Trial Counsel Claim**

In his second ground for relief, Long asserts he was deprived of the effective assistance of trial counsel when his attorney failed to investigate pretrial statements of Shelise Gilmore, Patrina Crawford, Melissa Howell, and Ruby Gentry and when he failed to secure the trial testimony of

Brandy Jones.

The First District Court of Appeals considered this claim on Long's appeal from denial of his motion for new trial and held:

> {¶31} Long contends that he is entitled to a new trial based on his trial counsel's ineffectiveness by failing to secure Brandy Jones as a witness and failing to investigate "the DNA record" as well as the statements of potential witnesses Wyatt, Gilmore, Gentry, and Howell.

> {¶32} The decision to grant or deny a motion for a new trial based upon a claim of ineffective assistance of counsel generally lies within the sound discretion of the trial court. That discretion cannot be disturbed on appeal absent a showing that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Hedgecoth*, 1st Dist. Hamilton No. C-020480, 2003-Ohio-3385, ¶ 22. To set aside a conviction and grant a new trial based on ineffective assistance of counsel, a defendant must establish two things. First, the defendant must demonstrate that his trial counsel's performance was deficient. Second, the defendant must demonstrate that the deficient performance resulted in prejudice; specifically, the defendant must establish that there exists a reasonable probability that the outcome of the trial would have been different were it not for his attorney's ineffectiveness. *Id.* at ¶ 23, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> {¶33} Here, Long argues that his trial counsel was ineffective in failing to secure Brandy Jones as a witness because an "investigator" spoke with Jones and then sent Long's trial counsel a memo indicating that Jones was a "material witness." But that memo also indicated that Jones described the man who had tried to enter the apartment building the night of the murder as having dreadlocks, which Long had. Further, and more importantly, Jones identified Long from a photo array as the "bloodied" man who was trying to enter the apartment building where she worked. Because Jones would have likely testified consistently with the statements she gave to police and in the memo, we cannot conclude that trial counsel's performance was deficient. But even if it was deficient, Long cannot demonstrate that he was prejudiced by his counsel's failure to secure Jones as a witness. Nor can Long show how his trial counsel's performance in any failing to investigate certain witnesses' statements or "the DNA record" was deficient and/or prejudiced his defense. None of the statements submitted by Long and discussed

20

> above with respect to the alleged *Brady* violations, nor the "DNA record," which does not contain an exculpatory DNA-test result, would have changed the outcome of Long's trial. Accordingly, Long cannot demonstrate ineffective assistance of counsel.

*State v. Long,* 2023-Ohio-132, ¶¶ 31-33 (Ohio App. 1ˢᵗ Dist. Jan. 18, 2023).

Because the First District decided this claim on the merits, Long's burden in habeas is to show that the decision is an objectively unreasonable application of Supreme Court precedent or is based on an unreasonable determination of the facts.

Regarding witness Brandy Jones, Long posits certain facts she might have testified to and the First District posited that she might well have testified consistently with the statement she made to the investigator which would have been unfavorable to Long.  Although not noted by the First District, Long admits that his counsel caused a trial subpoena to be served on Jones which she did not honor.  Long argues his trial counsel provided ineffective assistance when he "failed to ensure the Jones honored her subpoena." (Reply, ECF No. 25, PageID 2934).  How was he supposed to have done that?  By getting the trial judge to stop the trial in the middle and issue an arrest warrant for Jones? This argument is symptomatic of the sort of speculative hindsight from twenty years later that habeas courts are admonished to avoid.  It is very unlikely a trial judge of a busy metropolitan general jurisdiction court would require a jury to sit and wait on the execution of a contempt warrant.

Regarding alleged deficient performance from failure to investigate the pretrial statements of other witnesses, the First District considered each of these witnesses and found that failure to disclose their pretrial statements was not a *Brady* violation so that Long suffered no prejudice from the asserted failure to investigate.  Long's response lumps these witnesses together and asserts "[d]efense counsel also failed to conduct a thorough investigation even after he received information that should have compelled one. Therefore, Long was denied the effective assistance

21

of counsel that was predicted [sic] on the State intentional suppression of evidence." (Reply, ECF No. 25, PageID 2935).

The governing standard for ineffective assistance of counsel claims is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing Strickland, supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. Id., at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id*., at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The likelihood of a different result must be substantial, not just conceivable. *Id*., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

The First District correctly cited *Strickland* as providing the clearly established Supreme Court precedent on ineffective assistance of trial counsel. Long has failed to show its application of Strickland was objectively unreasonable, either as to deficient performance or as to prejudice. Long's ineffective assistance of trial counsel claim should therefore be dismissed on the merits.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends the Amended Petition be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

March 19, 2025.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. #